# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## WCA 06-1210


**ROLAND ROMERO**

**VERSUS**

**NORTHROP GRUMMAN CORP.**


********** 


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 02-02336
CHARLOTTE A. L. BUSHNELL, WORKERS' COMPENSATION JUDGE

**********


## JOHN D. SAUNDERS
## JUDGE

**********


Court composed of John D. Saunders, Jimmie C. Peters, and Michael G. Sullivan, Judges.

**AFFIRMED.**

**Aubrey D. Denton**
**Attorney at Law**
**P. O. Drawer 52110**
**Lafayette, LA 70505-2110**
**(337) 289-9151**
**Counsel for Plaintiff/Appellant:**
**Roland Romero**

**Mark L. Riley**
**Onebane Law Firm**
**P. O. Box 3507**
**Lafayette, LA 70502-3507**
**(337) 237-2660**
**Counsel for Plaintiff/Appellant:**
**Roland Romero**

**Christopher M. Trahan**
**Raggio, Cappel, Chozen, & Berniard**
**P. O. Box 820**
**Lake Charles, LA 70602-0820**
**(337) 436-9481**
**Counsel for Defendant/Appellee:**
**Northrop Grumman Corp.**

**SAUNDERS, Judge.**

Claimant, Roland Romero, became ill after exposure to organic solvents at his place of employment. He filed a claim against his employer, Defendant, Northrop Grumman Corporation. After a trial on the merits, the WCJ ruled in favor of Claimant, finding that he proved his condition was causally related to workplace exposure to toxic chemicals. On April 1, 2002, Claimant filed a separate Disputed Claim for Compensation against Defendant, alleging that Defendant failed to pay for his reasonable and necessary medical treatment. Defendant filed an answer on May 1, 2002; on January 21, 2003, he filed a motion for an expedited hearing seeking an order to compel Claimant to submit to a medical evaluation. In response, Claimant filed a motion to dismiss as well as several exceptions on February 12, 2003. The WCJ denied all motions and exceptions, as Claimant was hospitalized at the time of the hearing.

Defendant again filed a motion for an expedited hearing, seeking to compel Claimant to submit to a medical evaluation on July 9, 2003, which the WCJ granted. Defendant filed a motion and order to terminate unnecessary medical treatment on March 25, 2004. After a hearing on the motion on September 29, 2004, the WCJ appointed its own Independent Medical Examination (IME) physician to review the evidence and render a report. On May 8, 2006, the WCJ granted Defendant's motion, allowing the discontinuance of the unnecessary medical treatments. We affirm.

**FACTS AND PROCEDURAL HISTORY**

Claimant, Roland Romero, originally filed a Disputed Claim for Compensation (1008 claim) against Defendant, Northrop Grumman Corporation, on January 5, 1999, asserting that he had been diagnosed with organic brain syndrome and that his condition was the result of exposure to toxic chemicals during the course

of his employment. Claimant was employed by Defendant as an aircraft structures mechanic from November 1997 until March 1998, when he suddenly became ill. As an aircraft structures mechanic, Claimant's duties included cleaning the outboard sections of the wings of various aircraft, which he did using organic solvents.

Claimant first sought treatment of his illness with Dr. John Robert Mathias, a Houston, Texas neurogastroenterologist, on December 1, 1998. At that time, Claimant's main complaints were nausea, vomiting, early satiety, bloating, distention, and constipation. Claimant stated that his problems had begun four months previously when he had been exposed to a large dose of Toluene while at work. In Dr. Mathias' report dated December 8, 1998, he states that Claimant's major problem was that he could not have a bowel movement. He also found that Claimant had developed severe migraine headaches, had a neurogenic bladder, and was approximately one hundred pounds overweight. Dr. Mathias also conducted a five-hour glucose tolerance test and diagnosed Claimant with diabetes mellitus, also referred to as diabetes, type II.

On April 22, 1999, Dr. Mathias prescribed weekly injections of 30g of intravenous immuno gamma globulin (IVIg) for twelve weeks. On June 10, 1999, Claimant returned to Dr. Mathias' office and reported a "slight improvement" in his condition. Therefore, Dr. Mathias continued the weekly injections.

Dr. Mathias contacted Ella Daley, a former licensed practical nurse and the owner of La Bon Sante Health and Wellness Center in Lake Charles, Louisiana, regarding colon hydrotherapy to help alleviate Claimant's constipation. Claimant received the colon hydrotherapy at La Bon Sante, and at the time of the hearing, he was continuing to receive colon hydrotherapy treatments five times a week.

On January 11, 2001, Dr. Mathias wrote a prescription for equipment and home health care for manual lymphatic drainage, as well as a prescription for equipment and oxy-ozone sauna therapy treatment. Claimant then began receiving these treatments at La Bon Sante, as well as ear candling. On February 12, 2002, Dr. Mathias wrote a prescription stating that the lymphatic drainage could be done at Claimant's home and that a massage table was medically necessary.

Dr. Mathias referred Claimant to Dr. James P. Gaharan, a physician board certified in internal medicine hematology and board eligible in medical oncology, for the administration of the IVIg treatment. Dr. Gaharan first saw Claimant on April 26, 1999 and performed a basic physical examination. Dr. Gaharan's report reflects that Dr. Mathias had diagnosed Claimant with gastrointestinal motility disorder and that he had been receiving weekly 15g IVIg treatments.

Claimant's initial claim against Defendant was heard on February 14 and February 16, 2000. The WCJ ruled in favor of Claimant, finding that he proved his condition was causally related to workplace exposure to toxic chemicals. Defendant did not appeal the ruling of the WCJ; however, Claimant appealed the ruling on the limited issues of whether the WCJ had properly left the record open for later evidence on the question of Defendant's right to a credit and whether it erred in denying Claimant an award of penalties and attorney fees. On appeal, this court reversed the granting of a credit to the Defendant, as well as the denial of attorney's fees and penalties. Accordingly, Claimant was awarded $2,000.00, and $7,500.00, and Defendant was required to pay Claimant indemnity for his medical treatment.

Claimant subsequently instituted the instant litigation by filing a new Disputed Claim for Compensation (1008 claim), under a different docket number, on April 1,

3

2002, claiming that Defendant failed to pay for his reasonable and necessary medical treatment as required by the Workers' Compensation Act. Defendant filed an answer to the claim on May 1, 2002. Claimant subsequently filed an amended Disputed Claim for Compensation on May 28, 2002. On October 16, 2002, a joint motion to continue the matter originally scheduled for October 17, 2002 was filed and signed.

After taking the depositions of Claimant's two treating physicians, Defendant requested that Claimant submit himself to an evaluation by Dr. Richard Sachson, an endocrinologist in Dallas, Texas. Claimant, through his attorney, refused to submit to the requested evaluation. On January 23, 2003, Defendant filed a motion and order for an expedited hearing with the Office of Workers' Compensation (OWC) pursuant to La.R.S. 23:1124, seeking an order to compel Claimant to submit to an evaluation by Dr. Sachson. The order was signed by the WCJ on February 5, 2003, and the hearing was set for March 10, 2003.

In response, Claimant filed a motion and order to dismiss his 1008 claim relating to the issue of his medical treatment on February 12, 2003. At the same time, he filed a motion in limine and peremptory exceptions of res judicata, no cause of action and/or no right of action, arguing that Defendant was precluded from questioning the medical treatment Claimant was receiving by virtue of the judgment handed down by the WCJ, which found his claim to be compensable. The motion in limine and exceptions filed by Claimant were set to be heard on March 10, 2003, along with Defendant's motion for an expedited hearing.

Issuing its oral reasons for judgment at the hearing, the WCJ denied Claimant's motion and exceptions, as well as Defendant's motion for an expedited hearing because at the time of the hearing, Claimant was hospitalized with an infection and

4

there was concern that, according to reports issued by two of Claimant's physicians, it would be potentially dangerous for him to travel more than thirty to sixty minutes.

Defendant again filed a motion for an expedited hearing on July 9, 2003, seeking an order mandating Claimant to submit to evaluation by Dr. Bashar Saad, an internist and endocrinologist in Alexandria, Louisiana, and Dr. Austin J. Sumner, a neurologist in New Orleans. In response to Defendant's motion, Claimant filed a motion for a protective order, which was signed by the WCJ on July 11, 2003, and the hearing on said motion was set for October 30, 2003. After the motion was heard on October 30, the WCJ granted Defendant's motion, and Claimant was ordered to undergo evaluations by both Dr. Sumner and Dr. Saad.

Dr. Sumner, the Richard M. Paddison Professor of Neurology, professor of neuroscience, and Head of the Department of Neurology at Louisiana State University Health Sciences Center since 1988, was contacted on May 27, 2003 by defense counsel to determine whether Claimant's treatment was appropriate. In particular, he was asked to determine whether Claimant was suffering from any disease process which would be properly treated with IVIg, manual lymphatic drainage, home colonics (colon hydrotherapy), oxy-ozone sauna therapy, or ear candling.

Dr. Sumner reviewed copies of Claimant's medical records and various depositions and examined Claimant on January 14, 2004. He issued a report on his findings, dated March 12, 2004. During the examination, Claimant told Dr. Sumner that his "brain didn't work" and that he "had numbness in the left side of his face and weakness around the left shoulder and left leg." Dr. Sumner stated in his report that Claimant had diabetes mellitus and was morbidly obese. He also noted that Claimant complained of headaches, dizziness, nausea, vomiting, persistent metallic taste in his

5

mouth, blurring of vision, photophobia, progressive weight gain, and bladder problems, which culminated in the placement of a suprapubic catheter.

Dr. Bashar Saad, was also asked to evaluate Claimant and determine whether Claimant's medical treatment was appropriate. Before evaluating Claimant on January 19, 2004, Dr. Saad had the opportunity to review two boxes of medical records concerning Claimant's previous care. He noted that at his examination, Claimant complained of diabetes, type II, neuropathy, organic brain syndrome, atonic bladder, depression, gastrointestinal motor dysfunction, sleep apnea, headache, dizziness, numbness, lack of feeling in hands and feet, shortness of breath upon exertion, occasional vomiting, constant abdominal pain, and significant weight gain. Dr. Saad further noted that Claimant has been on weekly infusions of IVIg since April 1999. The results of the examination yielded a normal blood pressure and heart rate. Dr. Saad also noted in his report that Claimant was morbidly obese.

On March 25, 2004, Defendant filed a motion and order to terminate unnecessary medical treatment, asserting that Claimant was receiving four types of treatment which were not medically necessary: IVIg injections, manual lymphatic drainage, oxy-ozone sauna therapy, and ear candling. Accordingly, Defendant requested the WCJ to authorize the termination of the unnecessary treatments. The motion was signed by the WCJ on March 29, 2004, and the hearing on the motion was set for May 13, 2004. However, on May 12, 2004, the hearing was continued to September 29, 2004.

At the conclusion of the hearing on Defendant's motion to terminate unnecessary medical treatment, the trial WCJ requested that counsel for both parties submit post-hearing briefs and advised that it was considering appointing its own

6

IME physician pursuant to the Workers' Compensation Statute.

On June 7, 2005, the WCJ issued an order appointing Dr. Patricia Rosen, a toxicologist in Austin, Texas, to review the evidence and render a report on the issue of whether the IVIg treatments should be discontinued.

Dr. Rosen sent an email posing four questions to OWC on September 12, 2005, requesting additional information. The questions posed were:

1) What was the nature of exposures: specifically, what was the chemical and in what quantity (parts per million or other measure)?

2) Were others in the same environment affected and if so, how?

3) What was the period of time for each exposure?

4) Would I be able to evaluate Dr. Carson's report?

However, on September 14, 2005, Dr. Rosen submitted her report, dated September 12, 2005, without first obtaining the additional requested information from OWC.

On February 21, 2006, the WCJ sent correspondence to Dr. Rosen asking whether the opinion expressed in her report would change had she received the additional information. Dr. Rosen responded on March 15, 2006, stating that her opinion as to whether the use of IVIg should be discontinued would not change.

On May 8, 2006, the WCJ handed down its written reasons for judgment, granting Defendant's motion and allowing the discontinuance of the IVIg infusions, the manual lymphatic drainage, the oxy-ozone sauna therapy, and the ear candling. Claimant, now appeals with four assignments of error.

**ASSIGNMENTS OF ERROR:**

1) The WCJ erred in issuing a ruling in a matter which had been dismissed.

2) The WCJ erred in modifying the original judgment to allow the termination of medication already authorized based on the opinions of physicians who did not recognize the existence of Mr. Romero's disease.

3) The WCJ erred in modifying the original judgment to allow the termination of treatment that aided Mr. Romero's quality of life without properly considering the effects of termination on Mr. Romero.

**STANDARD OF REVIEW**

A trial court's factual determinations are subject to the manifest error standard of review and may not be overturned unless they are found to be "manifestly erroneous" or "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, p. 844 (La.1989). In applying the standard, the appellate court must determine not whether the trier of fact's conclusion was right or wrong, but that it was reasonable. *Stobart v. State*, 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous. *Id.* at 880. Therefore, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La.1990).

**LAW AND ANALYSIS**

**Assignment of Error No. 1:**

_____In his brief, Claimant argues that the WCJ erred in issuing a ruling in a matter which had been dismissed. He asserts that the underlying matter of the instant litigation, "Romero v. Northrop Grumman, Docket # 02-02336 District 04 OWC",

was filed pursuant to a 1008 claim filed by Claimant on April 1, 2002. On February 14, 2003, on the motion of Claimant, the matter was dismissed. Defendant later filed its motion to terminate unnecessary medical treatment on October 1, 2004. Claimant argues that without a new 1008 claim being filed, there was no pending litigation in which Defendant could file its motion and thus, no jurisdiction for the WCJ to issue rulings, as the claim had been dismissed.

Defendant counters, asserting that while La.R.S. 23:1310.3 provides that a claim for benefits shall be initiated "by the filing of the appropriate form with the office of workers' compensation administration", pursuant to La.R.S. 23:1310.8, the WCJ has continuing jurisdiction over each case, including the authority to order a physical examination of the employee. Louisiana Revised Statutes 23:1310.8 states, in pertinent part:

> A. (1) The power and jurisdiction of the workers' compensation judge over each case shall be continuing and he may, upon application by a party and after a contradictory hearing, make such modifications or changes with respect to former findings or orders relating thereto if, in his opinion, it may be justified, including the right to require physical examinations as provided for in R.S. 23:1123 . . . .
>
> . . . .
>
> B. Upon the application of any party in interest, on the ground of a change in conditions, the workers' compensation judge may, after a contradictory hearing, review any award, and, on such review, may make an award ending, diminishing, or increasing the compensation previously awarded, subject to the maximum or minimum provided in the Workers' Compensation Act, and shall state his conclusions of fact and rulings of law, and the director shall immediately send to the parties a copy of the award.

Therefore, Defendant avers that there is no requirement that each new dispute to be

brought before the workers' compensation court be initiated by the filing of a new 1008 claim. Defendant asserts that by filing a 1008 claim with the Office of Workers' Compensation (OWC) under a new docket number and instituting the instant proceedings, Claimant placed the provision of adequate medical care at issue. Defendant answered the claim and filed a motion for expedited hearing, requesting that Claimant be ordered to submit to a medical evaluation before Claimant moved to dismiss his claim. Therefore, Defendant contends that, although the provisions of workers' compensation law do not strictly follow the rules of our Code of Civil Procedure, when Defendant filed its motion for an expedited hearing, it essentially filed a reconventional demand, stating its own cause of action by putting the issue of what constituted appropriate medical care at issue. Accordingly, when Defendant then filed its motion to terminate unnecessary medical care, it was filing the equivalent of a supplemental petition in accordance with the provisions of La.Code Civ.P. art. 1155. Therefore, Defendant argues that dismissal of Claimant's principal demand did not affect or dismiss the reconventional demand, which had already been filed. Defendant additionally points out that at no time during the proceedings before the WCJ did Claimant object that any procedural flaw existed.

After examining the record, we do not find that any procedural flaw existed in the proceedings. Although Claimant filed a separate claim under a new docket number on April 1, 2002, La.R.S. 23:1310.8 clearly provides for continuing jurisdiction of the WCJ over each case. Pursuant to La.R.S. 23:1121, an employer has the right to have a claimant submit himself to an examination while the claimant is receiving payments from the employer under workers' compensation. Additionally, as stated earlier, under La.R.S. 23:1310.8, the WCJ had continuing jurisdiction to

10

make modifications or changes with respect to her former findings or orders upon Defendant's application. Therefore, Defendant could have filed its motion to terminate unnecessary medical benefits in the original proceedings. However, because Claimant filed a new 1008 claim, Defendant's motion was filed under the docket number of new proceedings. Nonetheless, we find that because Claimant put his medical treatment at issue in the instant proceedings, and Defendant filed its motion for an expedited hearing, which placed the appropriateness of Claimant's medical treatment at issue prior to Claimant's dismissal, Defendant's motion to terminate unnecessary medical benefits was properly before the WCJ. Further, as Defendant pointed out, Claimant made no objection at the trial court level. Had Claimant had any procedural objection, he should have raised such objection at the time of the hearing. Accordingly, we find that the WCJ did not err in ruling on the motion to terminate unnecessary medical treatment, as it was not dismissed with Claimant's claim. Thus, the matter is properly before us, and we may now address the appropriateness of Claimant's medical treatment.

**Assignment of Errors Nos. 2 & 3:**

Claimant contends that the WCJ erred in relying on the opinions of Dr. Saad, Dr. Sumner, and Dr. Rosen. He further contends that WCJ erred in modifying the original judgment to allow the termination of treatment that aided his quality of life without properly considering the effects of such termination.

Louisiana Revised Statutes 23:1203A provides that the employer must furnish all reasonably necessary medical treatment to an injured employee. It states, in pertinent part:

> In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care

11

and services, medical and surgical treatment, and any non-medical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public or private facilities as will provide the injured employee with such necessary services.

Claimant argues that although the medical treatments he was receiving were not working toward curing his condition, they are palliative in nature, and are therefore, considered reasonable and necessary. See *Dubois v. La. Forest Prods., Inc.*, 98-895 (La.App. 3 Cir. 12/9/98), 722 So.2d 409, *writ denied,* 99-49 (La. 2/26/99), 738 So.2d 586, *Veal v. Trans Gulf Inc.*, (La.App. 4 Cir. 9/23/98), 723 So.2d 987, and *Ferrier v. Jordache-Ditto's*, 94-1317, 94-1318 (La.App. 3 Cir. 5/17/95), 662 So.2d 14.

**Intravenous Immuno Gamma Globulin (IVIg)**

Claimant's treating physician, Dr. Mathias, initially prescribed the IVIg injections for Claimant. In his deposition, Dr. Mathias testified, " . . . if there were one thing that he was on that was controversial, it would be the gamma globulin." In his deposition, Dr. Mathias testified, "[T]he assumption is that he has an inflammatory polyneuropathy and therefore, it may help him." When asked what lead Claimant to be placed on IVIg, Dr. Mathias stated, "We have a man of severe disease. We have nothing to lose by trying it. He had slight improvement. That's why we continued." He further testified that he thought that Claimant felt better after receiving the IVIg treatment. However, he stated, "You know, whether we're doing anything over the long haul with gamma is, as I said, this may be the only thing that he's on that is of question."

Dr. Mathias testified that he would defer to Dr. Gaharan's experience on the issue of the harm associated with discontinuing the IVIg. However, he stated that he

thought it would be reasonable to discontinue the IVIg on a trial basis. He further pointed out that the central line necessary for the administration of IVIg is a risk factor for sepsis. He explained that if Claimant were to develop sepsis, "it would be the end" since Claimant has diabetes, and his immune response function is considerably impaired.

Dr. Gaharan testified that he only conducted a basic physical examination of Claimant and that he made no independent diagnosis of Claimant. Instead, he relied on the diagnosis of Dr. Mathias and on his findings regarding whether Claimant's condition necessitated IVIg treatment. In his deposition, when asked if he knew why Dr. Mathias prescribed the IVIg injections, Dr. Gaharan responded, "A demyelinating or polyneuropathy autonomic nervous system dysfunction secondary to toxic exposure from the chemicals that were mentioned in the first note." He further testified that his role in Claimant's IVIg treatments is basically that of a technician who administers the treatment and oversees the operations in the clinic.

Dr. Gaharan testified that if Dr. Mathias called and told him he was discontinuing Claimant's IVIg, he would want to know the reason because "this is a similar situation to other folks that we're treating immunoglobulin for demyelinating disorders and it's been my experience in those situations that doing that sort of thing usually results in detrimental effects on the patient." He expounded, "Based on my experience with other individuals ... discontinuing the medical treatments has resulted in a regression or progression, whichever way you want to phrase it, of their disease process. So, it's not been a good thing to do in those individuals." He went on to state that, in his opinion, it would not be good to do in Claimant's case, as it would pose a substantial risk, and it could potentially worsen his condition.

13

Dr. Sumner was contacted by defense counsel and asked to review Claimant's medical records, to perform an evaluation of Claimant, and to determine whether the medical treatment Claimant was receiving was appropriate. He was informed that WCJ had already made the determination that Claimant was suffering from an illness caused by workplace exposure to toxic chemicals. When asked in his deposition whether he felt that claimant's treatment with IVIg was inappropriate, Dr. Sumner responded, "Absolutely I feel that he was getting it inappropriately." He went on to state that he did not think "that there is any evidence, on the basis of my neurological assessment of Mr. Romero, that he suffers from immune mediated injury to the nervous system either centrally or peripherally." He further stated that the only condition under which such treatment would have been appropriate was if Claimant had suffered from chronic inflammatory demyelinated polyradicular (CIDP) neuropathy. However, in his opinion, there was no basis of such diagnosis by Dr. Mathias in the record. He went on to testify that, in his opinion, Claimant does not have polyneuropathy, nor does he have a condition caused by toxic solvent exposure that affected his autonomic nervous system. Rather, in his opinion, Claimant's symptoms are caused by diabetes. Thus, Claimant argues that Dr. Sumner, "while an undoubtedly excellent neurologist," is of "no help" to the case at hand because he does not believe that Claimant suffers from organic brain syndrome, and therefore, he does not think Claimant needs IVIg treatment.

Defendant counters this argument by pointing out that Dr. Sumner further testified that the neurological problems caused by exposure to organic solvents are not appropriately treated with IVIg. In fact, when asked whether IVIg would be appropriate treatment for such disease, Dr. Sumner's response was, "The answer is

14

most definitely no." Dr. Sumner admitted in his deposition that Claimant does have some symptoms of organic brain syndrome, as is indicated by a mild degree of atrophy of the brain on an MRI. Therefore, he stated, there is a possibility that Claimant's symptoms could be related to organic brain syndrome. He concluded by testifying that he did not find any evidence of any disease process which would be appropriately treated with IVIg, because even had he accepted that Claimant's problems were due to toxic exposure, there is no evidence that the mechanism of the injury would respond to IVIg. Dr. Sumner testified that Claimant explained that as far as he could tell, IVIg was having "no effect" on his symptoms, as he was not aware of any difference before or after he received the treatment.

In Dr. Sumner's opinion, there was at least as great a risk of death, if not greater, in continuing the IVIg treatment as in terminating it, as IVIg can induce kidney failure and stroke.

Dr. Rosen stated in her report to the WCJ:

> It was unclear why the patient was receiving Gamma Globulin treatment. There is a prevalent opinion by the experts interviewed that Gamma Globulin is not indicated and may be deleterious to this patient's health. The article of JAMA does not list any of Mr. Romero's medical conditions as benefitting from the use of Gamma Globulin. The Medline information also does not list any conditions that this patient has that would benefit from Gamma Globulin. Also, and of great concern, is that the person who is requesting this medication be given, does not feel it is indicated and is unsure of whether he recommended it in the first place. The person providing the medication says he is functioning as a technician and doesn't know the diagnosis that would indicate the need for this therapy. Intravenous Gamma Globulin is not indicated for this patient."

Claimant asserts that although Dr. Rosen stated in her report that IVIg is, in her opinion, unnecessary, the WCJ should not rely on this opinion, as she stated in the

15

next paragraph, "Additionally, the materials reviewed do not support injury of any sort by the chemicals is reported to be exposed to . . . . It is more likely that the patient's illness is due to some other disorder such as Alzheimer's." Defendant, in its brief, admits that Dr. Rosen went beyond the scope of her assignment by expressing in her report opinions relating to whether Claimant's problems were caused by toxic exposure. Nevertheless, as Defendant points out, Dr. Rosen directly answered the question posed to her by the WCJ.

Dr. Rosen requested additional information from OWC on September 12, 2005; however, she submitted her report to the court on September 14, before she obtained the requested information. In response to a query from the WCJ, Dr. Rosen stated that the additional requested information would not change her opinion that IVIg injections were inappropriate and unnecessary to treat any of Claimant's conditions.

Dr. James W. Albers, professor of neurology at the University of Michigan Health System at Ann Arbor, Michigan, also issued a medical report on the use of IVIg, specifically in relation to Claimant's medical condition. In his report dated September 8, 2002, he stated, "Based on my review of all materials you provided to me, I cannot determine the indication, or justification for the prescribed IVIg treatment." He went on to state that he is familiar with the medication and that he prescribes it frequently, particularly for CIDP. In his report, Dr. Albers discussed the dangers of IVIg as well. Although IVIg is relatively safe, Dr. Albers noted that IVIg does have side effects which include headache, fever, chills, flushing, nausea, dyspnea, dizziness, and abdominal cramps. He noted that in more severe cases, IVIg has also been linked to renal dysfunction, acute renal failure, and vascular complications. However, Dr. Albers stated in his report that the strongest argument

16

against the administration of IVIg is that the long term effects are unknown. He stated, "[i]f for no other reason, this should be the strongest argument against administering a medication to treat an undiagnosed condition using an expensive, potential dangerous medication, for which there is no justifiable indication."

Dr. Albers concluded his report, stating, "Based on my education and experience, and consistent with the results of my literature review, it is my opinion that the scientific evidence does not support the use of IVIg treatment for adult onset diabetes mellitus, any forms of toxic neuropathy, neurogenic bladder, gastroparesis, occupational exposure to solvents, or, for that matter, any identified occupational disease." He further states that Claimant does not suffer from any of the disorders for which IVIg has established medical efficacy, or for which IVIg is generally administered consistent with the standard of practice.

Based on this evidence, we do not find that the WCJ committed manifest error in allowing the discontinuation of the IVIg treatments. The physician who prescribed the IVIg testified that he did so based on an "assumption" and that they had "nothing to lose." All of the other physicians, with the exception of one, who did not conduct his own examination and admittedly relied on the diagnosis of Dr. Mathias, stated that the IVIg was inappropriate treatment for Claimant's condition. Additionally, the majority of the medical testimony seems to show that continuation of the treatment may pose more risks than benefits for Claimant. Only one physician indicated that Claimant's condition may worsen if treatment was discontinued. Even Dr. Mathias, the prescribing physician, had no objection to discontinuing the IVIg treatments on a trial basis. Considering the testimony of the physicians advising against the use of IVIg for Claimant's condition, the minimal impact IVIg has had on his condition, and

17

the risks involved in continuing the IVIg treatments, we find it reasonable that the WCJ allowed termination of the IVIg treatments.

**OTHER THERAPIES**

In addition to IVIg, Claimant was also receiving colon hydrotherapy, oxy-ozone sauna therapy, manual lymphatic drainage, and ear candling at La Bon Sante Wellness Center. At the hearing, the WCJ allowed Ms. Daley to be offered as an expert witness in homeopathic treatment or alternative medicine. Ms. Daley testified that she was originally contacted by Dr. Mathias because Claimant had been unable to produce a bowel movement for several weeks, and Dr. Mathias wanted to try colon hydrotherapy, a process that uses the continual flow of water to flush out old stool and toxins, to alleviate the problem.

Ms. Daley testified that although she initially saw Claimant only in connection with the colon hydrotherapy treatment, she later received prescriptions for oxy-ozone sauna therapy and manual lymphatic drainage therapy. At the time of the hearing, Claimant was receiving three oxy-ozone sauna therapy treatments a week at La Bon Sante. Ms. Daley explained that in oxy-ozone sauna therapy, the patient gets into a steam cabinet where oxygen and water combine to create O3 steam, or ozone, which opens up the pores of the skin and allows toxins to flow out. She stated that she believes Claimant derives a benefit from the oxy-ozone sauna therapy. She explained, "Well, number one, it relieves the aches and pains of his body; also gets the oxygen going into the bloodstream and into the brain, and he always feels good afterward."

Ms. Daley testified that she also performs manual lymphatic drainage therapy on Claimant. She described manual lymphatic drainage therapy as "a very light

18

massage" that stimulates the lymphatic system which "picks up those toxins and moves them out of the body through urination and defecation." When asked whether she believed Claimant benefits from the manual lymphatic drainage, Ms. Daley answered in the affirmative. She further explained, "He didn't stay swollen all the time like he used to stay. ... He just feels better."

In addition to the oxy-ozone sauna therapy and the manual lymphatic drainage therapy, Ms. Daley testified that she also removes the wax from Claimant's ears approximately once a week through a process called ear candling. Ms. Daley testified that Claimant accumulates an excessive amount of wax and fungus in his ears, which causes them to swell and become painful, so he benefits from this process. She stated that before the ear candling, Claimant suffered from a number of ear infections that required medical treatment; however, since beginning his treatment, she stated that he has experienced a reduction in the number of ear infections he has had. However, she was unable to testify as to whether or how often he had been to an ear, nose, and throat physician over that time.

Dr. Jeffery Joseph, an otolaryngologist and facial plastic surgeon, reviewed Claimant's medical records and was asked whether Claimant could benefit from ear candling. Dr. Joseph explained that ear candling is an alternative treatment for the removal of ear wax in which a hollow candle is placed in the ear and through some wicking action, cerumen or protective ear wax is sucked out of the ear. He also explained that the procedure is not one practiced by doctors. In his deposition, Dr. Joseph testified that the records reviewed reflected that Claimant was going to a spa once every couple of weeks, and at times, as much as once a week, to have this procedure performed. He testified that, in his opinion, ear candling has no medical

efficacy and there is "no reason anyone would need to have ear wax removed once a week or every other week." He went on to state that he was unable to find any literature to support that theory that exposure to organic solvents might cause excessive wax build up. He further testified that ear candling can be dangerous because there is a risk of burning the ear if hot wax drips into the ear canal, damaging the ear drum. Despite the danger associated with ear candling, Dr. Joseph testified that his main objection to the procedure is that it is not effective in removing ear wax.

Dr. Mathias testified that he had no opinion whether ear candling, oxy-ozone sauna therapy, or manual lymphatic drainage therapy were medically necessary. In fact, when asked, he did not even know what oxy-ozone sauna therapy was or what manual lymphatic drainage therapy accomplished, even though he is the physician who prescribed them for Claimant. He testified that he prescribed them after he had consulted with a physical therapist who recommended that Claimant might benefit from the therapies.

Dr. Sumner had "no idea" what oxy-ozone sauna therapy was, or why it was prescribed for Claimant's condition. He further stated that he was not aware of manual lymphatic drainage as an accepted medical treatment and stated, "Certainly, it is not something that I would regard as appropriate treatment." He testified instead that the appropriate treatment for swelling of Claimant's legs would be elastic stockings or elevation of the legs when sitting.

Based on this evidence, we do not find that the WCJ committed manifest error in allowing the termination of oxy-ozone sauna therapy, manual lymphatic drainage, or ear candling, as there is no evidence that they are reasonable or medically necessary for the treatment of Claimant's condition.

20

**CONCLUSION**

After our review of the record, we do not find that any procedural flaw existed in the proceedings. Therefore, we find that the instant matter was properly before the WCJ. Further, we do not find that the WCJ committed manifest error in allowing the termination of Claimant's IVIg treatment, manual lymphatic drainage therapy, oxy-ozone sauna therapy, and ear candling, as they are not necessary medical treatments for his work-related condition. Accordingly, we affirm the decision of the WCJ. All costs are assessed against Claimant, Roland Romero.

**AFFIRMED.**